**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER M. PERIGO,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:10cv2321 TCM** |
| | ) | |
| **JAY CASSADY,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM AND ORDER

Christopher M. Perigo (Petitioner), a Missouri prisoner, petitions the United States

District Court for the Eastern District of Missouri for federal habeas corpus relief from a

2008 conviction following a jury trial. See 28 U.S.C. § 2254. Respondent filed a response

[Doc. 9], including materials from the underlying state court proceedings.[2]

This matter is before the undersigned United States Magistrate Judge for review and

final resolution of the petition.[3] Finding that the pending federal habeas petition presents

---

[1] Petitioner has advised the Court that he is now at the Jefferson City Correctional Center
("JCCC"), rather than at the Southeast Correctional Center where he was when he filed his federal
habeas petition. Jay Cassady, the warden at JCCC, will, therefore, be substituted as the Respondent
in this federal habeas proceeding. See Rule 2(a) of the Rules Governing Section 2254 Cases in the
United States District Court. Although Petitioner named the Attorney General of the State of
Missouri ("Attorney General") as a Respondent in his pro se petition, the Court will not add him as
a respondent because, in this proceeding, Petitioner is not challenging a sentence he will be serving
in the future. See Rule 2(b) of the Rules Governing Section 2254 Cases in the United States District
Court.

[2] Some of the state court materials identify the minor victim. The Court will direct the
Clerk's Office to retain the state court materials under seal.

[3] This matter is before the undersigned United States Magistrate Judge on consent of the
parties. 28 U.S.C. § 636(c).

one ground for relief based on the alleged ineffective assistance of Petitioner's trial attorneys and that the ground lacks merit, this Court will deny the petition without further proceedings.

## **Background**

Petitioner was charged, as a prior offender, with two counts of statutory sodomy in the first degree, in violation of Mo. Rev. Stat. § 566.062, for having deviate sexual intercourse with D. G., a person under twelve years old, between January 1, 2006, and August 3, 2006, in Scott County, Missouri.  (Info. in lieu of Indictm., filed Dec. 19, 2007, Legal File, Resp't Ex. B, at 37-38; see also Indictm., filed Oct. 26, 2006, Legal File, Resp't Ex. B at 10.)

During a one-day trial in December 2007, the jury found Petitioner guilty on Count I and not guilty on Count II.  (Verdict Forms, Legal File, Resp't Ex. B, at 57 and 58.)  On April 1, 2008, the trial court sentenced Petitioner to a thirty-year term of imprisonment. (Sentence and J., Legal File, Resp't Ex. B., at 63-64.)

On April 7, 2008, Petitioner filed a timely direct appeal. (See Apr. 7, 2008, entry on docket sheet for State v. Perigo, No. 07BT-CR00345, Resp't Ex. B at 4.)  Petitioner raised two points in his direct appeal, basing both points on his contention that his rights to due process, a fair trial, "and to be tried for the offense with which he is charged, as guaranteed by the Fourteenth Amendment" were violated by alleged trial court errors.  (Pet'r Br., Resp't Ex. C.) First, Petitioner argued that those rights were violated by the trial court's admission into evidence, over Petitioner's objection, of evidence (a photograph) of two sexually explicit adult videotapes found in Petitioner's home.  (Id. at 20, 23.)  Secondly, Petitioner contended

that those rights were violated by the trial court's failure <u>sua</u> <u>sponte</u> to declare a mistrial when the State introduced extensive evidence that on the day Victim was removed from Petitioner's home he engaged in child endangerment "when he was passed out because he was intoxicated while he allowed Victim and her younger sister to be unsupervised and put themselves in dangerous positions." (<u>Id.</u> at 21, 31.)

The Missouri Court of Appeals for the Southern District affirmed Petitioner's conviction and sentence in a summary per curiam order, supplemented by a memorandum sent only to the parties setting forth the reasons for the decision. (Per Curiam Order and Mem. Supplementing Order Affirming J. Pursuant to Rule 30.25(b), dated Feb. 27, 2009, Resp't Ex. E.) The state appellate court set forth the factual and procedural background as follows.

> Victim was four years old at the time of the molestation. She lived with her mother, her younger sister, and [Petitioner]. In early 2006, she attended a program about good and bad touches and told her mother that [Petitioner] had touched her. Victim then said she was just trying to get [Petitioner] in trouble because she was mad at him. She also alleged a boy at school had touched her. Victim and her mother talked to the principal, who thought Victim was lying. Victim's mother was not allowed to testify that the little boy was not even in school on the day Victim alleged the boy had touched her or that Victim "made up stories."

> Victim told a neighbor girl that [Petitioner] had touched her in places with his finger and tried to rape her. The girl told Victim that rape is when a guy makes you lay down with him, and Victim responded, "yes, that's what he done." Later, Victim told the girl more allegations about [Petitioner] abusing her.

> The police visited [Petitioner]'s home on August 3, 2006, in response to a call regarding a child in the roadway. Victim was found outside the home. [Petitioner] and Victim's younger sister were found inside the home.

[Petitioner] was on the floor sleeping. One of the officers used his foot to nudge [Petitioner] awake. [Petitioner] was arrested for child endangerment and taken to the police station. At the station, he took a breathalyzer test, which registered his blood alcohol content at approximately .179.

Victim and her younger sister were taken to the police station after [Petitioner]'s arrest. While at the station, Victim said she had to use the bathroom and that it hurt. Based on this comment, one of the officers called the Division of Family Services to investigate. Victim was examined at a hospital, and the doctor did not make any conclusions to the police regarding abuse.

The next day, Victim was interviewed at Network Against Sexual Violence. The entire forensic interview was video recorded. The interview began with questioning by Brenda Sikes, a licensed professional counselor. Ms. Sikes asked Victim if she had ever been touched in the areas "where nobody can touch'"; Victim said no, except when she was taken to the doctor, and they "stuck a tube up" where nobody can touch. Victim said she had been taken to the doctor because it burned when she peed and she had a bladder infection. When Ms. Sykes asked if Victim had ever told a certain girl that she had been touched, she said she told the girl that the girl's two-and-a-half-year-old brother had touched her in places where people should not touch.

Ms. Sikes then asked if Victim had told the girl about anyone else touching her in places where people should not touch, and Victim said she had. When Ms. Sikes asked who had touched her, Victim pointed to the vaginal area of a diagram. After a break in the interview, Ms. Sikes said to Victim, "I understand that you told [name of a girl] that your dad touched you with his finger." Victim said [Petitioner] touched her with his finger. Ms. Sikes asked her where he had touched her with his finger, and Victim pointed to her vaginal area. She said [Petitioner] put his ring finger in the place where no one is supposed to touch. When describing what had happened, Victim said that [Petitioner] touched her skin, but she also maintained that her pants stayed on.

After Ms. Sikes interviewed Victim, the interview session was continued by Tammy Gwaltney. Ms. Gwaltney asked Victim if [Petitioner] had ever sucked on her body, and Victim said he sucked her "boobs." Victim told Ms. Gwaltney that [Petitioner] had movies of girls with their clothes off. She said "the girls had sex with the girls." Victim described the naked girls as "big girls like mom." Victim said that a "big" boy who was "fourteen" or "a hundred years old" also watched the movies with [Petitioner]. Victim also said

[Petitioner] had pictures of naked girls on the computer. She said there was a camera on the computer that [Petitioner] used to take nude photographs of her mother and two neighbor women. He then made movies out of those photographs. Victim also said that [Petitioner] licked a neighbor woman's "boobs." She further said that [Petitioner] told her that he looked at pictures of children with their clothes off on the computer. Victim told Ms. Gwaltney that [Petitioner] said that if she ever told anyone what happened, he would "give her a whooping with hot sauce in her mouth."

The police searched [Petitioner]'s home and a nearby home into which [Petitioner] was moving. Two adult VHS videotapes, "Playboy: Sexiest Home Videos" and "Dream Girls Mardi Gras Uncensored Volume #1," were found in [Petitioner]'s home. No homemade movies of naked women or photographs of naked women were found.

At some point, [Petitioner] was interviewed by the police. At first, [Petitioner] denied penetrating Victim's vaginal area. He then described three times that he accidently touched her in her vaginal area while he was helping her to bathe or change her clothes. One of those times, his hand accidentally penetrated Victim's vagina.

(Mem. Supplementing Order Affirming J. Pursuant to Rule 30.25(b), dated Feb. 27, 2009, Resp't Ex. E, at 2-5 (one footnote omitted) (twelfth alteration in original).)

With respect to point one, challenging the admission of the "photograph of the two adult VHS videotapes found in [Petitioner]'s home," the state appellate court found:

Prior to trial, defense counsel told the [trial] court that as a matter of trial strategy, he wanted to show the jury the entire recording of Victim's forensic interview even though it also contained evidence of uncharged crimes committed by [Petitioner]. He wanted the jury to hear the allegations Victim made so that he could later attack her credibility by pointing out that they were unsubstantiated due to the lack of evidence found in [Petitioner]'s home and were contradicted by the testimony of witnesses. Defense counsel specifically said he wanted to argue that Victim's statement in the interview was "ludicrous" because she alleged that [Petitioner] made homemade movies, but none were found in [Petitioner's] home. The [trial] court ruled that it would allow the entire forensic interview to be played for the jury.

Although defense counsel wanted the entire forensic interview to be shown, he also filed a motion in limine to exclude, among other things, evidence of the two adult VHS videotapes. Defense counsel argued the two adult VHS videotapes were not legally or logically relevant because they do not prove the guilt or innocence of [Petitioner] and are more prejudicial than probative. He also argued that the State wanted to use the two adult VHS videotapes as propensity evidence.

The State argued in response to the motion in limine that if defense counsel attacked Victim's credibility by putting on evidence of Victim's unsubstantiated allegations, then the State should be permitted to bolster Victim's credibility by showing a photograph of the two adult VHS videotapes, which substantiated Victim's allegation that [Petitioner] had movies of naked girls. The State offered to not bring into evidence the photograph of the two adult VHS videotapes if defense counsel did not bring up the fact that homemade movies were not found when [Petitioner]'s house was searched, but defense counsel stated that he was certainly going to talk about those items.

Defense counsel did indeed discuss the unfound items throughout the course of the trial. During his opening statement, he stressed the importance of the forensic interview and commented that Victim's statements were outlandish. Defense counsel then told the jury that although Victim said that there were things like homemade movies in the home, the only thing found by the police were two adult VHS videotapes. Defense counsel even described the two adult VHS videotapes to the jury saying, "You see these? This is basically a Girls Gone Wild or Playboy tape. It's not a pornographic tape. It's an adult tape of women without their clothes on." Defense counsel also asked about the contents of the two adult VHS videotapes during direct examination of [Petitioner]. [Petitioner] explained that the two adult VHS videotapes contained images of naked girls, but there were no images of girls having sex.

During his cross-examination of Victim, defense counsel asked her if she remembered telling the interviewers that [Petitioner] made movies with two neighbor women; she said she did not remember. During his case in chief, defense counsel presented the testimony of one of the neighbor women who Victim had named during the forensic interview as being in [Petitioner]'s homemade movies and as having had her "boobs" licked by [Petitioner]. The neighbor woman testified that [Petitioner] never took any nude photos of her and never licked her "boobs." Defense counsel also argued in closing that Victim should not be believed. He stressed that her testimony did not match the evidence obtained at the home in that the police did not find any pictures.

He also pointed out that her statements during the forensic interview did not match the testimony of the neighbor woman.

We first address the logical relevance of the photograph of the two adult VHS videotapes. Because there was no physical evidence of abuse and no witnesses to the abuse other than Victim, the State's case ultimately depended on Victim's testimony and, therefore, her credibility. Defense counsel made it clear prior to trial that he intended to play the entire forensic interview for the jury and use it to attack Victim's credibility by showing that items mentioned by Victim, such as homemade movies, were not found in [Petitioner]'s home. Defense counsel then employed this strategy throughout the trial.

Against this attack by defense counsel, any evidence the State could have adduced that would have corroborated Victim's testimony regarding other events in the home would have bolstered her credibility. The photograph of the two adult VHS videotapes did just that; Victim said during the forensic interview that [Petitioner] had naked girl movies, and then the two adult VHS videotapes featuring naked women were found in [Petitioner]'s home. Thus, the photograph of the two adult VHS videotapes was logically relevant.

The photograph was also legally relevant. We initially note that the two adult VHS videotapes were not admitted into evidence; only the photograph of the two adult VHS videotapes was admitted. Defense counsel explained to the jury during his opening statement that the two adult VHS videotapes were not pornographic but were basically videotapes of women without their clothes. During direct examination of [Petitioner], defense counsel asked if Girls Gone Wild tapes contained girls having sex, and [Petitioner] replied that they did not. Even if some jurors disapproved of the two adult VHS videotapes because they contained naked women, we do not think that a photograph of the two adult VHS videotapes was prejudicial enough to have deprived [Petitioner] of a fair trial. The probative value of the photograph was not outweighed by a risk of unfair prejudice to [Petitioner]. Because the photograph was both logically and legally relevant, the trial court did not abuse its discretion in admitting it into evidence. Point I, therefore, is denied.

(Mem. Supplementing Order Affirming J. Pursuant to Rule 30.25(b), dated Feb. 27, 2009, Resp't Ex. E, at 5-8.)

In resolving the second point, in which Petitioner challenged, under plain error

review, "the trial court's failure to declare a mistrial when the State introduced evidence that on the day Victim was removed from his home, [Petitioner] had committed child endangerment when he left Victim and her younger sister unsupervised and allowed them to put themselves in dangerous positions because he was passed out from intoxication," the Missouri Court of Appeals stated:

> It is within this Court's discretion to review a claim by way of plain error. Rule 30.20. [Petitioner] has the burden of demonstrating plain error by showing "(1) that the error was plain, i.e., evident, obvious, and clear; (2) that a failure to correct the error would produce a manifest injustice or a miscarriage of justice; and (3) that the error was outcome determinative." State v. Moore, 252 S.W.3d 272, 275 (Mo. [Ct.] App. . . . 2008) (internal citations omitted). Trial courts have broad discretion in determining relevance and admissibility of evidence, and we will find error only upon a showing of an abuse of that discretion. [State v.] Liles, 237 S.W.3d[ 636,] 638-39 [(Mo. Ct. App. 2007)]. Additionally, because a mistrial is a drastic remedy, a trial court should sua sponte declare a mistrial only in exceptional circumstances. [State v.] Ondo, 232 S.W.3d [622,] 627 [Mo. Ct. App. 2007)]. [Petitioner] has failed to demonstrate that the [trial] court committed any error, plain or otherwise, by admitting evidence of [Petitioner]'s intoxication and arrest for child endangerment. We, therefore, decline to exercise our discretion to review for plain error.

> As noted earlier, it was [Petitioner]'s arrest for child endangerment that led to the investigation of the offense charged in this case. When police arrived at the home, Victim was found outside the home. [Petitioner] and Victim's younger sister were found inside the home. [Petitioner] was on the floor sleeping. An officer nudged [Petitioner] awake. [Petitioner] was arrested and taken to the police station. At the station, he took a breathalyzer test, which registered his blood alcohol content at approximately .179. Victim and her younger sister were taken to the police station after [Petitioner]'s arrest. While at the station, Victim said she had to use the bathroom and that it hurt. This comment alarmed one of the officers, so she called the Division of Family Services to investigate.

> Evidence of prior uncharged misconduct is generally not admissible to show the propensity of the defendant to commit such crimes. State v. Turner,

242 S.W.3d 770, 777 (Mo. [Ct.] App. . . . 2008). Evidence of prior uncharged misconduct is admissible, however, when the misconduct is part of a sequence of events surrounding the charged offense and the evidence helps to present a complete and coherent picture of the events that transpired. Id. at 778. Victim and her younger sister were taken to the police station after [Petitioner]'s arrest for child endangerment. While at the police station, Victim disclosed facts leading to the sexual abuse investigation. Because [Petitioner]'s intoxication and arrest for child endangerment led to the investigation of the sodomy charge in this case, that misconduct was part of the sequence of events surrounding the sodomy charge. Furthermore, evidence of the intoxication and child endangerment helped to present to the jury a complete and coherent picture of the events that transpired by explaining why the police first became concerned that Victim had been sexually abused. The trial court did not err in admitting the evidence of [Petitioner]'s intoxication and arrest for child endangerment and by failing to sua sponte declare a mistrial. Point II is denied.

(Mem. Supplementing Order Affirming J. Pursuant to Rule 30.25(b), dated Feb. 27, 2009, Resp't Ex. E, at 9-11.) Petitioner did not pursue review by a higher court, and the Missouri Court of Appeals issued its mandate on March 17, 2009. (See docket sheet for State v. Perigo, No. SD29075 (Mo. Ct. App. filed Apr. 7, 2008) (docket sheet available at https://www.courts.mo.gov/casenet/cases/searchDockets.do) (last visited Mar. 10, 2014).)

On May 21, 2009, Petitioner filed a timely pro se motion under Mo. S. Ct. Rule 29.15 ("post-conviction motion"). (Pet'r Post-Conviction Mot., filed May 21, 2009, Legal File, Resp't Ex. F, at 4-11.) In this motion, Petitioner argued his trial attorneys failed to investigate and call Dr. Kevin J. Blanton, who would have testified that he prescribed medicine that was applied on the vaginal area; failed to get DNA test results; and failed to do enough discovery or to investigate the case sufficiently. (Id. at 5-6, 10-11.)

Through his post-conviction motion attorney, Petitioner subsequently filed an

amended post-conviction motion, including a request for an evidentiary hearing. (Pet'r Am. Post-Conviction Mot., filed Aug. 31, 2009, Legal File, Resp't Ex. at 12-35.) In that motion, Petitioner alleged his trial attorneys denied him the effective assistance of counsel: by failing to investigate and call as a witness at trial Victim's treating physician, Dr. Blanton; by failing properly to object and seek a curative instruction or mistrial when a State's witness violated a trial court order in limine; by failing to raise in Petitioner's motion for judgment of acquittal or in the alternative for new trial, newly discovered evidence that Victim was coached during Petitioner's trial; and by failing to object and preserve for appellate review a challenge to the testimony of Sykes and Gwaltney, "who used suggestive and leading questions when questioning [Victim] in order to obtain evidence against [Petitioner]." (Id. at 13-14.)

On December 3, 2009, after an evidentiary hearing at which Victim's mother, Dr. Blanton, Petitioner's trial attorneys, and Petitioner testified (see Hr'g Tr., Resp't Ex. G), the motion court issued findings of fact and conclusions of law overruling Petitioner's amended post-conviction motion ("post-conviction j.").[4] (Post-Conviction J., Legal File, Resp't Ex. F, at 36-43.) In explaining its decision, the motion court stated, in part, that "[t]he [trial] attorneys were credible witnesses, and the court resolves conflicts between their testimony and the testimony of [Petitioner] in favor of the attorneys." (Id. at 39.)

Petitioner then filed a timely appeal on December 10, 2009. (Pet'r Notice of Appeal,

---

[4] The judge presiding over Petitioner's post-conviction proceedings, the Honorable Paul McGhee, was not the same judge who presided over Petitioner's trial proceedings, the Honorable Mark L. Richardson.

filed December 10, 2009, Legal File, Resp't Ex. F, at 45-46.)  In his one point on appeal,

Petitioner argued that his right to the effective assistance of counsel as guaranteed by the

Sixth and Fourteenth Amendments was violated by his trial attorneys' failure to investigate

and call as a witness Dr. Blanton,

> whose testimony would have supported [Petitioner]'s defense by establishing
> that at the time of the alleged incident, [Victim] was being treated for vaginitis
> with a topical ointment that was applied to [Victim]'s genital area, which
> would explain the burning sensation when [Victim] urinated and any touching
> of [Victim]'s genitals that may have occurred.

(Pet'r Br., Resp't Ex. H, at 20, 21.)

The Missouri Court of Appeals for the Southern District affirmed the motion court's

judgment in a summary per curiam order, supplemented by a memorandum sent only to the

parties setting forth the reasons for the decision.  (Per Curiam Order and Mem.

Supplementing Order Affirming J. Pursuant to Rule 84.16(b), dated Oct. 13, 2010,  Resp't

Ex. J.)  The state appellate court set forth the factual and procedural background as follows.

> A jury found [Petitioner] guilty of sodomizing his girlfriend's four-year-old
> daughter, D. G., via digital penetration.  The defense theory was that any
> touching was accidental and investigators essentially coerced D. G. into
> believing that [Petitioner] did something wrong.  To this end, [Petitioner]
> testified that he accidentally touched D. G.'s vagina three times – during a
> bath, after a bath, and while getting her dressed – and penetrated her vagina on
> one such occasion.  This testimony essentially mirrored [Petitioner]'s prior
> statement to police.

> Both [Petitioner]'s direct appeal and Rule 29.15 action were
> unsuccessful.  He now appeals the latter and has abandoned every claim but
> one.

> [Petitioner] still contends that trial counsel were ineffective for not
> calling Dr. Blanton to testify that D. G. suffered vaginitis for which the doctor

had prescribed a topical ointment. Such testimony, [Petitioner] argues, would have shown "the necessity of D.G.'s genital area being touched to treat the condition of vaginitis," and would have explained any touching of D. G.'s genitals "that may have occurred."

(Mem. Supplementing Order Affirming J. Pursuant to Rule 84.16(b), dated Oct. 13, 2010,

Resp't Ex. J, at 2.)

The state appellate court then found no clear error by the motion court and affirmed

the motion court's judgment:

We cannot reverse the motion court's denial of this claim unless [that denial] was clearly erroneous. Tinsley v. State, 258 S.W.3d 920, 924 (Mo. [Ct.] App. 2008). [Petitioner] must definitely and firmly convince us that a mistake was made. Id.

Crooks v. State, 131 S.W.3d 407 (Mo. [Ct.] App. 2004) likewise involved an allegation that trial counsel did not investigate or call a potential witness. The claim failed for two reasons. First, [the] "Movant failed to identify Davis as a witness he wanted called," and "it is reasonable for counsel to rely on the statement of his client in procuring witnesses." Id. at 410-11. Second, "in any event, Davis' testimony would not have unqualifiedly supported the defense offered." Id. at 411. Thus, "counsel was not ineffective for failing to interview or call Davis at [the] Movant's trial." Id.

The same can be said here. The motion court at least implicitly found that [Petitioner] did not identify or suggest Dr. Blanton as a potential witness, and expressly found that the doctor's testimony would not have provided a viable defense. Rather, as the motion court correctly observed, "[Petitioner] did not claim that he touched [V]ictim's vaginal area while placing ointment on her; his statement to the police and his testimony were that the touches were accidental."

[Petitioner]'s claim suffers both of Crooks' deficiencies, either of which defeats his appeal. The motion court did not clearly err. Judgment affirmed.

(Mem. Supplementing Order Affirming J. Pursuant to Rule 84.16(b), dated Oct. 13, 2010,

Resp't Ex. J, at 2-3.) Petitioner did not seek review by a higher court and the state appellate

court issued its mandate on October 29, 2010. (See docket sheet for State v. Perigo, No. SD30244 (Mo. Ct. App. filed Dec. 10, 2009) (docket sheet available at https://www.courts.mo.gov/casenet/cases/searchDockets.do) (last visited Mar. 10, 2014).)

On December 10, 2010, Petitioner filed his federal habeas petition, which sets forth one ground for relief, that his trial attorneys did not provide effective assistance of counsel. In support of this ground, petitioner sets forth only the following information:

> [Petitioner] lived with [Victim's mother] (Mother) and her daughters, [Victim] and [another daughter], in a mobile home in Scott County (Tr. 269, 400-01, 424, 426). In 2005 and 2006, Victim attended a school that had a program about good and bad touches (Tr. 404, 415-16). At some point around the first part of 2006, Victim told mother that [Petitioner] had touched her (Tr. 404, 410-11, 414). When Mother questioned [Victim] further about it Victim admitted that she was just trying to get [Petitioner] in trouble because she was mad at him (Tr. 405, 414, 419-20). Mother had never seen any signs of abuse on her children (Tr. 406). Victim had also made an allegation that a little boy at school had touched her (Tr. 286, 405). Victim and Mother talked to the principal (Tr. 286). The principal thought [Victim] was lying (Tr. 286).

> At some point, Victim told a neighbor girl that [Petitioner] had touched her in places with his finger and tried to "rape" her (Tr. 271-72, 280, 290, 293, 296, 297). The neighbor girl testified that rape meant a guy forcing you to lay down with him (Tr. 290, 294). When the girl told Victim what rape meant, Victim said "Yes, that's what he done" (Tr. 290, 294). The girl told her mother that Victim had said that [Petitioner] "touches" Victim (Tr. 291, 299). The girl's mother asked Victim if [Petitioner] had touched her, and Victim said that he had touched her with his finger (Tr. 271-72, 280, 291, 299, 300, 303-04, 307-08).

> A couple of days later, the neighbor girl's mother told a welfare caseworker about it when the worker was visiting about an allegation that she did not have any food in the house (Tr. 300-01, 305).

> Later, Victim talked to the neighbor girl and she told her that [Petitioner] had done a little more each time (Tr. 291). The girl confronted [Petitioner] and told him that she knew what he had done to Victim and she

-13-

would appreciate it if he would stop (Tr. 291, 434, 443). [Petitioner] might have told the girl that his hand might have slipped when he was giving Victim a bath, but he never purposely touched her (Tr. 443). Victim also told a neighbor boy that [Petitioner] had raped her and touched her in a private area (Tr. 309-10, 312, 315). The boy said that rape meant when a guy touches a girl in a "nasty place" (Tr. 310).

On August 3, 2006, Officer Lana Cooper of the Miner Police Department went to [Petitioner]'s residence in response to a call regarding an unattended child (Tr. 210-11, 306). There were two children at the residence including Victim (Tr. 213-14, 235). Eventually, the children were taken to the police station in Miner (Tr. 214). While there, Victim said she had to go to the bathroom and that "it hurt" (Tr. 215). This alarmed Officer Cooper, so the Division of Family Service (DFS) were called to investigate (Tr. 215-16).

Victim was taken to be examined at Missouri Delta Medical Center in Sikeston (Tr. 216, 226-27). The physical examination was not conclusive regarding suspected abuse (Tr. 227). An appointment was made for the following day at NASV (Network Against Sexual Violence) in Cape Girardeau (Tr. 216, 317).

On August 4, 2006, Brenda Sikes, a licensed professional counsel interviewed Victim at NASV (Tr. 319, 333). Victim was four years old at that time (Tr. 321). Sikes's interview was interrupted a number of times by knocks on the door from her supervisor, Tammy Gwaltney, who wanted to assist [with] the questioning (Tr. 364).

(Pet'r Pet. at 7, 11-13 [Doc. 1] (footnote omitted).) In printed handwriting the words "to here" follow the last sentence just quoted. Id. at 13.

Characterizing the petition as "ending abruptly," and without addressing the timeliness of Petitioner's federal habeas petition, Respondent addresses Petitioner's federal habeas petition based on Respondent's assumption that Petitioner's sole claim of "ineffective assistance of counsel is the same claim briefed and addressed by the Missouri Court of Appeals during the post-conviction appeal." (Resp't Response at 4 [Doc. 9 at 4].) Because

that is the only ineffective assistance of counsel claim presented to the state appellate court in Petitioner's post-conviction motion proceeding, this Court will resolve Petitioner's federal habeas claim based on that assumption.

Respondent argues this ground does not entitle Petitioner to federal habeas relief because the Missouri Court of Appeals reasonably considered and rejected the merits of this issue during Petitioner's post-conviction motion appeal; and that decision was not contrary to or an unreasonable application of clearly established federal law.

## Discussion

Petitioner asserts his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments was violated by his trial attorneys' failure to investigate and call as a witness Dr. Blanton,

> whose testimony would have supported [Petitioner]'s defense by establishing that at the time of the alleged incident, [Victim] was being treated for vaginitis with a topical ointment that was applied to [Victim]'s genital area, which would explain the burning sensation when [Victim] urinated and any touching of [Victim]'s genitals that may have occurred.

Respondent counters that the state court of appeals correctly and reasonably denied this claim in accordance with the principles set forth in **Strickland v. Washington**, 466 U.S. 668 (1984).  Specifically, Respondent pointed to that state court's finding that evidence of Petitioner's intentional touching of Victim's vaginal area to apply ointment did not support Petitioner's trial testimony that he accidentally touched Victim's vagina three times and penetrated it during one of those three instances.

The available record reveals that Petitioner defended the alleged offenses at trial by

-15-

testifying that he had accidentally penetrated Victim's vagina during one of three incidents of accidental touching of Victim's vaginal area when Petitioner was bathing or dressing Victim. (Trial Tr. at 428-31.) The Missouri Court of Appeals concluded Petitioner's trial attorneys did not provide ineffective assistance of counsel in failing to investigate and present Dr. Blanton because Petitioner had not identified him as a potential witness and the doctor would not have provided a viable defense, due to the defense that any touching of Victim by Petitioner occurred accidentally rather than intentionally. (Mem. Supplementing Order Affirming J. Pursuant to Rule 84.16(b), dated Oct. 13, 2010, Resp't Ex. J, at 2-3.)

Standard of Review. "In the habeas setting, a federal court is bound by the [Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA')] to exercise only limited and deferential review of underlying state court decisions." **Lomholt v. Iowa**, 327 F.3d 748, 751 (8th Cir. 2003). Under this standard, a federal court may not grant relief to a state prisoner unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is contrary to clearly established United States Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." **Williams v. Taylor**, 529 U.S. 362, 413 (2000). If the state court's decision is not "contrary to" clearly established law,

then the standard of "unreasonableness," applies and is "meant to be difficult to meet, and 'even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.'" **Williams v. Roper**, 695 F.3d 825, 831 (8th Cir. 2012) (quoting <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011)), <u>cert. denied</u>, 134 S. Ct. 85 (2013). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." **Taylor**, 529 U.S. at 407-08; <u>see</u> <u>also</u> **id.** at 413. "The unreasonable application inquiry is an objective one." **de la Garza v. Fabian**, 574 F.3d 998, 1001 (8th Cir. 2009). For a summary ruling issued by a state court, the petitioner can only satisfy the "unreasonable application" prong of habeas review by showing there is no reasonable basis for the state court decision, which the habeas court assesses by determining what arguments or theories could have supported the state court decision and whether fairminded jurists could disagree that those arguments or theories are inconsistent with a prior decision of the United States Supreme Court. **Cullen v. Pinholster**, 131 S. Ct. 1388, 1402 (2011) (quoting <u>Harrington</u>, 131 S. Ct. at 784, 786).

In reviewing state court proceedings to ascertain whether they are contrary to or involve an unreasonable application of clearly established federal law, this Court "is limited to the record that was before the state court that adjudicated the claim on the merits." **Id.** at 1398. Additionally, this Court's review is limited to consideration of the United States Supreme Court precedents at the time the state court issues its decision on the merits. **Greene v. Fisher**, 132 S. Ct. 38 (2011) (relying on <u>Cullen</u>, <u>supra</u>); <u>accord</u> **Losh v. Fabian**,

592 F.3d 820, 823 (8th Cir. 2010) ("[o]nly rulings in [United States] Supreme Court decisions issued before the state court acts are considered clearly established federal law, for a state court does not act contrary to or unreasonably apply clearly established federal law if there is no controlling [United States] Supreme Court holding on the point" (citations omitted)). The state court does not need to cite to Supreme Court cases, "'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" **Revels v. Sanders**, 519 F.3d 734, 739 (8th Cir. 2008)) (quoting Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam)).

Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" **Harrington**, 131 S. Ct. at 785; accord **Brown v. Luebbers**, 371 F.3d 458, 462 (8th Cir. 2004) (en banc) ("[T]he 'summary nature' of the [state court's] discussion of [a] federal constitutional question does not preclude application of [§ 2254's] standard"). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." **Harrington**, 131 S. Ct. at 784-85; accord **Johnson v. Williams**, 133 S. Ct. 1088, 1094 (2013) (Harrington presumption applies "when a state-court opinion addresses some but not all of a [petitioner]'s claims"). This presumption may "in some limited circumstances be rebutted." **Johnson**, 133 S. Ct. at 1096.

Additionally, in a federal habeas action pursued by a state prisoner, "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by

the petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).    A state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings "only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." **Ryan v. Clarke**, 387 F.3d 785, 790 (8th Cir. 2004) (internal quotation marks omitted) (quoting <u>Jones v. Luebbers</u>, 359 F.3d 1005, 1011-12 (8th Cir. 2004)). The deference owed by a federal habeas court to a state court's findings of fact includes deference to state court credibility determinations, **Smulls v. Roper**, 535 F.3d 853, 864 (8th Cir. 2008) (en banc), and to "[a] state court's findings of fact made in the course of deciding" an ineffective assistance of counsel claim, **Odem v. Hopkins**, 382 F.3d 846, 849 (8th Cir. 2004).    Moreover, the presumption of correctness of findings of fact applies to the factual determinations made by a state court at either the trial or appellate levels.    **Smulls**, 535 F.3d at 864-65.

An accused's Sixth Amendment right to the assistance of counsel is a right to the effective assistance of counsel.    **Marcrum v. Luebbers**, 509 F.3d 489, 502 (8th Cir. 2007) (citing <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 377 (1986)).    In **Strickland**, <u>supra</u>, the Supreme Court established a two-part test for determining whether or not an attorney provided effective assistance of counsel.    The petitioner must establish both deficient performance, i.e., that "counsel's representation fell below an objective standard of reasonableness," and prejudice, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Strickland**, 466 U.S. at 687-88, 694.

For the performance prong of an ineffective assistance of counsel claim, a petitioner must demonstrate that "counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney." **Armstrong v. Kemna**, 534 F.3d 857, 863 (8th Cir. 2008) (citing Strickland, 466 U.S. at 687-89). "Only reasonable competence, the sort expected of the 'ordinary fallible lawyer,' is demanded by the Sixth Amendment." **White v. Helling**, 194 F.3d 937, 941 (8th Cir. 1999) (quoting Nolan v. Armontrout, 973 F.2d 615, 618 (8th Cir. 1992)). The court is highly deferential in analyzing counsel's conduct and "'indulg[es] a strong presumption that counsel's conduct falls within the wide range of professional judgment.'" **Armstrong**, 534 F.3d at 863 (quoting Middleton v. Roper, 455 F.3d 838, 846 (8th Cir. 2006)).

To establish prejudice, there must be a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Strickland**, 466 U.S. at 694; **Armstrong v. Kemna**, 590 F.3d 592, 595-96 (8th Cir. 2010) (quoting McCauley-Bey v. Delo, 97 F.3d 1104, 1105 (8th Cir. 1996)). "'A reasonable probability is [a probability] sufficient to undermine confidence in the outcome.'" **Armstrong**, 590 F.3d at 596 (quoting McCauley-Bey, 97 F.3d at 1105); accord **Carroll v. Schriro**, 243 F.3d 1097, 1100 (8th Cir. 2001) (quoting Strickland, 466 U.S. at 694). The petitioner bears the burden of showing such a reasonable probability. **Lawrence v. Armontrout**, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient. See **Parkus v. Bowersox**, 157 F.3d 1136, 1140 (8th Cir.

1998). Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice. See **Strickland**, 466 U.S. at 697; **Williams v. Locke**, 403 F.3d 1022, 1025 (8th Cir. 2005).

Here, Petitioner urges that his trial attorneys provided ineffective assistance by failing to interview and present Dr. Blanton as a witness during trial regarding the need to apply topical ointment to Victim's vaginal area. Petitioner has not satisfied his burden to show the incorrectness or unreasonableness of the Missouri Court of Appeals' determination that he failed to establish this ineffective assistance of counsel claim. Nor has Petitioner provided clear and convincing evidence to rebut the presumption of correctness this Court must accord any decision of the state court regarding a factual issue, including credibility determinations, pertaining to that claim.

Petitioner's trial testimony clearly established his defense that any touching of Victim's vaginal area, including penetration of Victim's vagina, by him was accidental. As the state court found, any information Dr. Blanton would have provided about a need to apply ointment to Victim's vaginal area would address an intentional touching, which would not support Petitioner's defense that any inappropriate touching of Victim's vaginal area was accidental. Without more, the Court is unable to conclude that the failure of Petitioner's trial attorneys to interview Dr. Blanton or to present him as a trial witness constituted the ineffective assistance of counsel.

Under the circumstances, the state appellate court's decision is not contrary to or an unreasonable application of clearly established federal law, and is not based on an

unreasonable determination of the facts in light of the evidence presented in state court.

Petitioner's sole ground for relief, alleging the ineffective assistance of his trial attorneys, is denied.

## Conclusion

Having found Petitioner's only ground for relief is without merit, his federal habeas petition will be denied.

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that Jay Cassady be **SUBSTITUTED** as the Respondent in this proceeding.

**IT IS FURTHER ORDERED** that the paper exhibits of the underlying state court proceedings filed by Respondent be **RETAINED UNDER SEAL**.

**IT IS FURTHER ORDERED** that the habeas petition filed by Christopher M. Perigo be **DENIED** without further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

 /s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of March, 2014.